# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ALLEN NELSON, | CV F  07-00466 AWI DLB HC |
|         Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
|     v. | |
| W.J. SULLIVAN, | [Doc. 1] |
|         Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### RELEVANT HISTORY

Following jury trial in the California Superior Court for the County of Kern, Petitioner was convicted of assault with a deadly weapon upon a peace officer (Cal. Penal Code § 245; count1), eluding a pursuing peace officer with a willful or wanton disregard for safety (Cal. Vehicle Code § 2800.2; count 2), and resisting or deterring an executive officer (Cal. Penal Code § 69; count 3).  In a bifurcated court trial, Petitioner was found to have suffered five prior "strike" convictions (Cal. Penal Code §§ 667(c)-(j), 1170.12(a)-(e)).  Petitioner was initially sentenced to three consecutive sentences of 25 years to life in prison.  (Lodged Doc. No. 1.)

Petitioner filed a notice of appeal in the California Court of Appeal, Fifth Appellate District.  The Court of appeal affirmed the judgment, but modified the sentence on count two to be stayed, resulting in a sentence of 50 years to life.  (Lodged Doc. No. 1.)

1   On November 18, 2004, Petitioner filed a petition for review in the California Supreme
2   Court. (Lodged Doc. No. 2.) The petition was summarily denied on January 19, 2005. (Lodged
3   Doc. No. 3.)

4   On January 27, 2006, Petitioner filed a petition for writ of habeas corpus in the Kern
5   County Superior Court. (Lodged Doc. No. 4.) The petition was denied on January 30, 2006.
6   (Lodged Doc. No. 5.)

7   On March 30, 2006, Petitioner filed a petition for writ of habeas corpus in the California
8   Court of Appeal, Fifth Appellate District, which was denied on April 21, 2006. (Lodged Doc.
9   Nos. 6, 7.)

10  On July 26, 2006, Petitioner filed a petition for writ of habeas corpus in the California
11  Supreme Court, which was denied on February 14, 2007. (Lodged Doc. Nos. 8, 9.)

12  Petitioner filed the instant federal petition for writ of habeas corpus on March 10, 2007,
13  which was transferred to this Court on March 14, 2007, and filed on March 22, 2007. (Court
14  Docs. 1, 2.)

### STATEMENT OF FACTS[1]

Shortly after 12:30 a.m. on December 21, 2002, California Highway Patrol (CHP) Officer McCarron was in uniform, on duty, and riding a marked CHP motorcycle northbound on Interstate 5 in Los Angeles. As he approached Valencia Boulevard, the speed limit dropped from 65 to 55 miles per hour due to a construction zone near Magic Mountain.

As McCarron entered the construction zone, he noticed a teal-colored Ford Explorer being driven by Nelson at approximately 82 miles per hour. McCarron positioned his motorcycle alongside in an attempt to get Nelson's attention, and the two made eye contact. Nelson accelerated; McCarron kept pace and again established eye contact. McCarron intended to contact Nelson concerning his speed in a construction zone, but Nelson suddenly veered into McCarron's lane of travel. McCarron was forced to swerve and slam on his brakes to avoid a collision. In swerving, he came a matter of inches from a concrete jersey wall barrier.

McCarron positioned himself behind and to the left of Nelson's vehicle, and activated his lights and siren. Nelson sped up and wove in and out of traffic across all three lanes.[2] While in

---

[1] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District, Lodged Document Number 1. The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

[2] Although traffic was light, it was somewhat condensed at this location because the road contracted from four lanes to three narrow lanes due to the construction.

the construction zone, Nelson was driving approximately 90 miles per hour, although the pursuit reached 105 miles per hour for several minutes.

As they exited the construction zone and approached Hazard Canyon Road, McCarron saw material coming from the driver's side window of Nelson's vehicle. A lot of it was paper, but McCarron also saw some change and what looked like a couple small pieces of wood, and he thought he saw a piece of glass shatter. The bulk of the debris struck the front of his motorcycle, but some hit McCarron in the helmet and a small portion hit him in the face. As McCarron saw the debris coming, he applied his brakes and swerved to try to avoid striking most of it. At the same time, Nelson applied the Explorer's brakes and swerved in the same direction as McCarron. Although speeds varied, Nelson and McCarron were still traveling between 80 and 100 miles per hour. When Nelson applied his brakes, his bumper came less than a car length from McCarron's motorcycle.[3] McCarron dropped back about 10-15 car lengths from the Explorer and moved to the right rear of the vehicle. The same kind of debris now came out of the passenger's side window, but McCarron managed to avoid most of it. Nelson continued to swerve in and out of what was now four lanes of traffic. At times, he used the center divider to pass vehicles.

At Lake Hughes Road and then the Frazier Park exit in Gorman, two patrol car units joined the chase. As CHP policy is to have two vehicles in pursuit, McCarron dropped out at the Frazier Park exit, which is in Kern County. All told, he had pursued Nelson for some 38-42 miles.

CHP Officers Huot and Yanez, who were assigned to the Fort Tejon area, responded to the Gorman area in a marked CHP vehicle when they were notified of the pursuit. The officers-both of whom were in uniform-took over the pursuit position closest to Nelson's vehicle, with lights and siren activated. During the time they were involved in the pursuit, Nelson's speed varied from 80-105 miles per hour as he worked his way through traffic.

On the downgrade, Nelson began to make sharp, sudden lane changes, and to close on what traffic there was to the point that impact appeared imminent before he moved around the slower vehicle. Approximately a mile south of the bottom of the Grapevine, Nelson was traveling approximately 80 miles per hour when he came upon a big rig, for which the speed limit was 35 miles per hour. Nelson quickly slowed, then made a sharp lane change and rear-ended a van that was traveling northbound at approximately 65 miles per hour. Nelson's vehicle came to a stop in the traffic lanes with Nelson pinned against the steering wheel, unconscious. Huot had to extricate him from the vehicle.

In giving an overview of the case to the jury, the prosecutor asserted that Nelson's driving pattern was egregious, and that he endangered people's lives by speeding and swerving in and out of traffic. The prosecutor argued that Nelson threatened Officer McCarron with his vehicle by almost forcing him off the road, and that he threw debris which hit McCarron and also suddenly slowed so that his vehicle nearly struck the motorcycle. The prosecutor noted that Nelson was still maintaining his reckless driving pattern when the other officers joined the pursuit.

Turning specifically to the charge of assault with a deadly weapon on a peace officer, the prosecutor argued that Nelson's vehicle constituted the deadly weapon. The prosecutor noted that he had to prove Nelson willfully committed an act which, by its nature, would probably and directly result in the application of physical force to another. The prosecutor told the jury:

---

[3] An average car length is about 10-12 feet.

> "What I'm talking about initially ... is when Officer McCarron attempted to make contact with the defendant the second time by driving up to his window and making eye contact ..., and at that time the defendant threatened Officer McCarron with a vehicle because he swerved into Officer McCarron's lane.
>
> The swerve wasn't a gradual swerve. It was, as Officer McCarron testified, a sudden move left or a jerk left, and it caused Officer McCarron to almost go into the cement block that was on the left side of that ... lane. That is a threat. That is an assault by the defendant with that vehicle upon Officer McCarron.
>
> Well, the defendant also assaulted Officer McCarron in another way. I'm talking about the debris that he was throwing out of the driver's-side window.
>
> "And when Officer McCarron was getting hit with that debris, the defendant slammed on his brakes. He slams on his brakes going 90 miles an hour, probably reduces his speed to 80 miles an hour or some sort. Officer McCarron was only three car lengths away from him.... [¶] ... [¶] The defendant willfully applying those brakes, you can infer he meant for Officer McCarron on a motorcycle to collide with the rear of his vehicle, assaulted Officer McCarron."

With respect to the charge of eluding a pursuing officer, the prosecutor argued that Nelson's driving pattern proved he willfully fled, as he had numerous opportunities to pull over. The prosecutor asserted that Nelson willfully eluded all of the officers involved in the pursuit, and pointed out that the pursuit was 47 miles long and only ended when Nelson crashed. He subsequently told jurors: "You can conclude from the evidence that the defendant had the specific intent to evade the officers during this pursuit and you can reach that conclusion at any point during this pursuit. It doesn't have to be at the end when he collided with the maroon van."

With respect to count 3, the prosecutor argued that Nelson attempted to deter McCarron from performing his duties by refusing to stop when McCarron tried to pull him over. He further argued that Nelson attempted to deter the CHP officers (including Huot) by willfully fleeing from them and refusing to stop. The prosecutor stated: "The defendant could have pulled over at any time, and each time the defendant had the opportunity to pull over and failed to do so, that is an attempt to deter California Highway Patrol. It's that simple." The prosecutor then argued that Nelson used threats, force, and violence in his attempt to deter, with the threats arising from his swerving toward McCarron, applying his brakes with McCarron a short distance behind him, and throwing debris from his windows. The prosecutor concluded: "In proving this third count ..., you need not look further than the threat, because we can all agree-or at least the evidence was presented the defendant threatened Officer McCarron in at least three separate ways, the debris that was thrown from the windows and the driving pattern, the swerve to the left and the braking, applying the brakes. Those are three separate threats, and you can use any three of them to determine the defendant guilty of this charge."

Defense counsel asked the jury to find Nelson guilty of lesser offenses as to all three charges. The prosecutor responded that Nelson sped and wove in and out of traffic "for 47 miles, with a purpose he wanted to get away from the officers because they were going to stop him." He urged jurors to consider the case as a whole, and not to be "picking out the first swerving and analyzing it, what was his intent at that point, picking out the debris coming through the windows and then analyzing it." He told jurors to consider the circumstances as they happened, the whole half hour of the pursuit." He argued that one assault occurred when Nelson swerved his vehicle at McCarron's motorcycle, while a second, separate assault occurred when Nelson slammed on his brakes while McCarron was close behind him. He then stated:

> "That [the instances of assault] kind of dovetails into Count Number 3....
> [B]y driving away in a vehicle you cannot use that as a force, but Penal Code

4

Section 69 also states delaying an officer in the performance of his duties through force-through threat, force, or violence.

"And we obviously have threat if you believe he intentionally operated the vehicle in Count 1-if you believe, rather, he intentionally swerved that vehicle to the left or intentionally applied his brakes or, for that matter, threw out the debris from both windows, because those are examples of threats and those are exactly what the defendant did for Count Number 3."

Jurors were instructed, pursuant to CALJIC No. 17.01, that with respect to each count, the prosecution had presented evidence of more than one act or omission upon which a conviction could be based, and all jurors had to agree on the same act or omission in order to return a guilty verdict. Jurors did not state in their verdicts the specific act(s) on which they based the convictions. During deliberations, however, they sent out a note which stated: "We need Officer McCarron's testimony of when the brakes were applied to deter him." That testimony was read; within 40 minutes of the note, the jury reached a verdict of guilty on all charges.

The probation officer's report recommended imposition of consecutive terms of 25 years to life on each count. However, the probation officer who was present at sentencing expressed concern whether count 3 was distinguishable enough from count 2 so as to justify consecutive terms. When asked to state his position, the prosecutor responded:

"MR. LUA: Well, Judge, I think we could play the facts in such a way to justify consecutive sentencing. I think also that we can interpret the facts to justify a stay on Count 3.[¶] ... [¶] We can interpret the defendant's actions during those 47 miles to justify consecutive sentencing merely by stating that the defendant's initial conduct or initial action insofar as throwing things out of the window could have justified the Penal Code Section 69 against Officer McCarron.

"Also his eluding Officer McCarron through the construction zone-and this is after-or even before the defendant threatened Officer McCarron with the vehicle.... [¶] ... [¶] As the Court remembers, there are additional California Highway Patrol officers that were engaged in the pursuit coming from Fort Tejon and following it until the defendant ultimately collided with the van and that could justify the 2800.2 or the felony evading.

"And the driving pattern described by the officers of the defendant was such that he was weaving in and out of lanes, going right up against big rigs and then changing lanes immediately. They even observed him driving in the center divider, passing vehicles on the left and on the roadway, which was not part of the lanes, and ultimately, when trying to negotiate a quick turn from ... behind a tractor-trailer, that's when he collided with the maroon van that was traveling at a far slower speed than maybe even he anticipated.

"So in playing the facts there is justification for consecutive sentences, but I would submit that to the Court.

"THE COURT: You're saying you're not that-let me see if I understand your thought process.
"You're saying that the assault with a deadly weapon is the moving of the vehicle into the path of Officer McCarron's BMW motorcycle.

"MR. LUA: Correct.

"THE COURT: And the PC 69 amounts to the throwing out of the window

5

> from the vehicle picture frames, glass, other items that hit, I don't know, the officer and/or his body, and that the evading-the PC-I'm sorry, the CVC 2800.2 is the chase that ensued after Fort Tejon officers gave chase to the vehicle.
>
> "MR. LUA: Yes.
>
> THE COURT: And the vehicle was eluding at an excessive rate of speed with the officers Code 3 following?
>
> "MR. LUA: Correct."

Defense counsel merely stated his agreement with the probation officer. Subsequently, in sentencing Nelson, the court stated:

> "In terms of the appropriate sentencing, the Penal Code Section 667(e)(2)(A)(ii) or Penal Code Section 1170.12(c)(a)(1)(ii) scheme of 25 years to life is ... appropriate in this case. Inasmuch as Penal Code Section 667(e)(2) requires a maximum term to be the greatest of the three possibilities, I believe the 25-years-to-life sentence is mandated and will be recommended and will be imposed as to each count.
>
> "I feel consecutive sentencing is justified per our earlier comments and is appropriate inasmuch as, one, the crimes were committed at different times or separate places, as we've chronicled earlier, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior.
>
> "To define a single period of aberrant behavior I think it would stretch the concept here. We have over a 30-mile range. We have multiple officers involved, multiple acts, glass thrown from a car amounting to-appear to be like a flying guillotine at the officer.
>
> "Two, the crimes involve separate acts of violence or threats of violence, as I've indicated."

## DISCUSSION

A.  <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v.

Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.       Enhancement Of Sentence Based On Oregon Prior Convictions

Petitioner contends that the trial court committed judicial misconduct and abused its discretion by not striking his Oregon convictions.  Petitioner raised this claim to the California Supreme Court by way of his petition for writ of habeas corpus, which was summarily denied. (Lodged Doc. Nos. 8, 9.)

AEDPA's strict standard of review is relaxed when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, the federal court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir.2007), *quoting* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").

Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985).  A petition alleging only a violation of state law is subject to dismissal for failure to state a claim.  See Howell v. Mississippi, 543 U.S. 440 (2005).  A state law claim merely rephrased by simply citing a due process violation, likewise does not state a claim.  See Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999).  Although Petitioner attempts to phrase his claim as a federal constitutional challenge, it is nonetheless a claim of error involving the pure application of state law.

\\\\

D.     Imposition Of Sentence On More Than One Count

Petitioner contends that his due process rights were violated by the trial court's imposition of multiple punishments based on similar conduct. Petitioner argued in the state court that punishment on counts one and three constituted a violation of California Penal Code § 654.[4] (Lodged Doc. Nos. 1, 8.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

As Respondent correctly points out, this Court does not have the authority to review a challenge to § 654, under state law. However, the Double Jeopardy clause precludes multiple punishments for the same offense. See Witte v. United States, 515 U.S. 389 (1995); United States v. DiFrancesco, 449 U.S. 117, 129 (1980). The determination of whether punishments are "multiple" is a question resolved by turning to the legislative intent. See Missouri v. Hunter, 459 U.S. 359, 366-368 (1983). "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932).

Here, applying the Blockburger test, the criminal offenses of assault with a deadly weapon

---

[4] Section 654 states:

(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

9

upon a peace officer (count one) and resisting or deterring an executive officer (count three), are distinct and separate offenses under California law.  See Cal. Pen. Code §§ 245(c) & 69.[5,6] As Respondent correctly submits, count one requires proof that Petitioner committed an assault with a deadly weapon - a fact not required under count two.  In addition, count two requires proof that Petitioner deterred a peace officer or firefighter - an element not required under count one. Therefore, because both offenses are separate and distinct, Petitioner's sentence on both counts did not violate the Constitution.

Furthermore, as stated by the Court of Appeal, the factual circumstances of the case support different sentences:

> With respect to counts 1 and 3, we conclude that, under the circumstances of this case, the court properly could rely on the acts of swerving and throwing debris out of the windows, respectively, in terms of its sentencing decisions. [fn] As noted, the prosecutor presented all three acts to the jury as justifications for convictions on counts 1 and 3.

(Lodged Doc. No. 2; Opinion, at 11.)  Thus, the appellate court's factual findings that the act of swerving his vehicle toward the officer was sufficient to constitute assault or deterrence of a peace officer, and the throwing of debris from his vehicle striking officer McCarron was also sufficient to justify assault or deterring a peace officer, are not "based on an unreasonable determination of the facts in light of the evidence in the state court proceeding."  (Id. at 10-12.) Nor was the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

---

[5] Section 245(c) states:
> Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years.

[6] Section 69 states:
> Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment.

E.     Ineffective Assistance Of Trial Counsel

Petitioner contends that trial counsel did not provide adequate representation because he should have called his wife and another woman, Ladner, as witnesses to testify regarding his state of mind around the time of the high-speed chase. Petitioner also claims counsel should have considered other defenses such as diminished capacity.

Petitioner raised these claims to the California Supreme Court by way of petition for writ of habeas corpus, which was summarily denied. (Lodged Doc. Nos. 8, 9.) Thus, this Court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d at 981, *quoting* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d at 982.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

In presenting a claim of ineffective assistance based on counsel's failure to call witnesses, Petitioner must identify the witness, U.S. v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985), show that the witness was willing to testify, U.S. v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that the witness's testimony would have been sufficient to create a reasonable doubt as to guilt. Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990); see also United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would have testified to and how such testimony would have changed the outcome of the trial, there can be no ineffective assistance of counsel). The absence of affidavits from uncalled witnesses puts a petitioner's claim at a disadvantage. Howard v. O'Sullivan, 185 F.3d 721, 724 (7th Cir. 1999) ("failure to submit supporting affidavits from [the] potential witnesses would severely hobble [the petitioner's] case.")

It appears that Petitioner argues that testimony provided by his wife and friend, Ladner, would have supported his defense of "diminished capacity" at the time of the commitment offense. Although Petitioner identifies his wife and friend, Ladner, as witnesses, Petitioner fails to elaborate on the impact of their testimony. Petitioner claims, in generic terms, that his wife could have described his speech and demeanor during the episode; however, he fails to

demonstrate that she was willing to testify and the absence of an affidavit from her greatly diminishes his claim.  Likewise, Petitioner fails to demonstrate that Ladner was willing to testify and does not provide the substance of such testimony.  Indeed, after the guilt phase, Petitioner presented the testimony of a defense expert and his own testimony as to his mental capacity.  Specifically, the defense expert interviewed and examined Petitioner regarding his mental state.  He opined that Petitioner suffered from bipolar disorder and two recent head traumas; however, he was unable to conclude that Petitioner was legally insane.  (See RT 344, 348-349, 353.)  Petitioner also testified under oath indicating that he did not remember the chase or being treated for his physical injuries.  (RT 359-361.)  Petitioner has simply failed to demonstrate that the testimony of either witness would have been sufficient to create a reasonable doubt as to his guilt, given that there was sufficient evidence before the trial court as to his sanity at the time of the commitment offense.  As Respondent submits, any anecdotal testimony would have had to overcome both the expert's conclusion that Petitioner was sane, and any arguable bias apparent in their testimony.  Mere speculation that a different lawyer or different strategy would have changed the result is insufficient to demonstrate prejudice.  Cooks v. Spaulding, 660 F.2d 738, 740 (9th Cir. 1991).

With regard to Petitioner's claim that counsel failed to address any other kinds of defense and only visited him twice in jail, it too fails under Strickland.  First, Petitioner has failed to demonstrate that counsel was incompetent for failing to consider other defenses, such as diminished capacity, in lieu of or in addition to the two defenses actually presented at trial.  Second, even if, as Petitioner contends, counsel visited him on only two occasions, such circumstance does not render counsel's performance deficient.  Lastly, Petitioner has failed to demonstrate any resulting prejudice.  As set forth by Respondent, trial counsel effectively put forth two defenses, one at trial and one at sentencing.  At trial, counsel argued that there was a reasonable doubt as to the requisite intent to commit the charged crimes, and the facts were subject to more than one reasonable interpretation.  (RT 232-262.)   Then, after the guilt phase, counsel sought to convince the trial court that Petitioner was not sane at the time of committing the offenses.  (RT 392.)  The fact that defense counsel's efforts to persuade the jury and the trial

1 court were unsuccessful, such result does not render counsel's performance deficient or
2 demonstrate prejudice under Strickland.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and,

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **September 22, 2008**         /s/ **Dennis L. Beck**
                                    UNITED STATES MAGISTRATE JUDGE